May 30, 1892.   Motion to reform judgment by entering the same in favor of the plaintiff for three quarters salary.

Eo die.   Motion for reargument.

PER CURIAM, January 4, 1893:

Reargument refused.

The judgment of this court is modified so as to permit a recovery for salary under the special law for Allegheny County.

## Shearman et al. v. Morrison, Appellant.

*Trustee—Attorney in fact—Funds received outside the letter of his appointment.*

Money received by an attorney in fact and trustee for others, which is not within the letter of his appointment, but which is received by virtue of his appointment with the consent of his principals, and with which he has charged himself as trustee, is to be accounted for as trust funds.

*Trust funds—Set-off—Credits—Tenants in common.*

Where three tenants in common agree in writing that the income shall be received by one of them and half of it deposited in bank to the credit of a mortgage on the property and the other half divided among them, not only the half applicable to the mortgage but the whole of the money received by the attorney in fact under the agreement is a trust fund; and, in accounting therefor, the attorney in fact cannot set off claims which were due him by his co-tenants when he accepted the trust.

In such a case credit may be allowed the accountant, except as against the half of the fund applicable to the mortgage, for the expense of repairs and improvements to the common property, commenced and carried on with the consent of all three parties, and as to which accountant acted as treasurer and paymaster.

*Trustee—Bill for account—Costs.*

Where a trustee's disregard of his duty has caused a suit to be instituted against him for an accounting, etc.; and, through lack of careful business methods and confusion of his characters as an individual, administrator and trustee, he has misapplied the trust funds, the costs will be imposed upon him.

Argued May 3, 1892.   Appeal, No. 216, Jan. T., 1892, by defendant, B. G. Morrison, trustee, from decree of C. P. Warren Co., March T., 1887, No. 62, in equity.   Before PAXSON, C. J., STERRETT, GREEN, McCOLLUM and MITCHELL, JJ.

Bill in equity by Mary E. Shearman and Charles F. Morrison for an account and an injunction.

The case was referred to William Schnur as master. His report, as to the facts, was as follows :

" It appears from the evidence taken and from the pleadings, that Stephen R. Morrison died on or about the 20th day of June, 1883, leaving to survive him a widow and three children. The children were B. G. Morrison, C. F. Morrison and Mary E. Morrison, intermarried with S. P. Shearman.

" Stephen R. Morrison died possessed of some personal estate, and seised of some real estate in the counties of Warren and McKean, in the commonwealth of Pennsylvania.

" Of this real estate, there were about 700 acres, part of tract 3725 in Kinzua (Corydon ?) township, Warren county.

" The real estate in Warren county was quite largely incumbered with judgments to one J. M. Wardwell and perhaps others.

" After the death of said Stephen R. Morrison, B. G. Morrison was appointed administrator to settle the estate. There not being enough of the personal estate to pay this indebtedness, and the parties to this bill being desirous to save as much as possible of their father's estate, plans were entered into by them to raise money enough to enable them to find a suitable purchaser or lessee of the land in Kinzua (Corydon ?) township for oil purposes. It being the idea of the parties and particularly of B. G. Morrison that this land was valuable for petroleum.

" The parties endeavored to get out ties and manufacture lumber from this land in Kinzua (Corydon ?) township, but not long after said operations were commenced, said J. M. Wardwell, who was a lien creditor, issued an estrepement to stay waste, and this put an end to this mode of raising money.

" Considerable time had run on since the appointment of the administrator without any fruitful results to the creditors, and Wardwell issued an execution. The sheriff of Warren county levied upon the land and advertised it for sale. The sheriff's sale, however, did not occur, because the court stayed the writ on application of the administrator.

" Before any other proceedings took place on the execution, at least before any sale thereon, the administrator effected a sale of the land in the orphans' court to one W. C. Warner as trustee.

" As has already been stated, the parties to this bill believed this property valuable for petroleum, and that this was particularly the belief of B. G. Morrison is evidenced by the testimony. He from the very first tried to obtain a purchaser or lessee thereof, and his efforts in that direction seem to have been constant and unremitting.

" Several wells had been put down and others were being put down in the vicinity of this land, the results of operations ranging from failure to success. This land was, however, being gradually approached by these developments, indicating more and more its value for oil.

" About the 11th day of June, 1885, the Parker & Phillips well was struck within 600 yards of said tract 3725 and produced for a time 250 barrels of oil per day. About two months afterwards Smith, Bright & Co. also struck a good well between the Parker & Phillips well and this tract.

" Mr. Cadwallader and the Anchor Oil Co. had been examining this property—their attention having been called to it by B. G. Morrison.

" About the time the Smith, Bright & Co. well was struck, or in a few days thereafter, an arrangement was entered into whereby the property was to be sold at orphans' court sale to W. C. Warner as trustee, which is the same sale hereinbefore referred to.

" The sale to Warner, as trustee, was for the consideration of $25,000. Of this sum $15,000, was to be paid in hand to B. G. Morrison as administrator of Stephen R. Morrison's estate, and the balance of $10,000, secured by a judgment bond and mortgage on the premises, payable to B. G. Morrison as administrator, in equal payments, in one and two years with interest.

" As an additional consideration under the arrangement effected by B. G. Morrison, said Warner was to execute a lease of a portion of said land to Cadwallader and the Anchor Oil Co. at the one eighth royalty and one fourth working interest in the first four wells drilled upon the property, and a conditional bonus of $7,500 to the parties to this bill.

" The royalty, bonus and one fourth working interest being for the benefit of said B. G. Morrison, C. F. Morrison and Mary E. Shearman in equal shares.

" Of course these parties had to pay the one-fourth operating expenses in the four wells, in which they had the working interest.

" Still in addition to the foregoing considerations, the said Warner was to execute a deed in fee for all said land to said B. G. Morrison, C. F. Morrison and Mary E. Shearman, subject to said bond and mortgage and lease.

" Warner was to remain trustee of the one fourth working interest belonging to said B. G. Morrison, C. F. Morrison and Mrs. Shearman under said lease, and to receive the products of that interest and apply the proceeds thereof to the payments of the costs and expenses, until said proceeds would pay the one fourth of the costs and expenses of the four wells to be drilled; but said trusts to continue only until the said costs and expenses are paid, ' and in no event longer than six months after the completion of the fourth well.'

" These were the terms of the sale of said land as secured by B. G. Morrison.

" A decree of the orphans' court of Warren county was procured, and the land was sold to said Warner, trustee, in accordance therewith.

" The fifteen thousand dollars was paid; the bond and mortgage for $10,000 was executed, the lease was made, and the deed for the land also executed.

" Oil wells were put down on this land which proved quite productive.

" The trust in W. C. Warner did not cover the royalty, being limited to the working interest.

" On the 14th day of September, 1885, Mrs. Shearman and C. F. Morrison constituted B. G. Morrison their attorney and agent by the following writing :

" ' It is hereby mutually understood and agreed and we do hereby constitute B. G. Morrison our lawful attorney and agent to sign division papers of the National Transit Co., or any other Pipe Line that may run oil from lease made to Anchor Oil Co., and others on that part of warrant No. 3725, leased to said company and hereby authorize him to sell the same according to his best judgment. This said power of attorney to cover both the royalty of one-eighth ($\frac{1}{8}$) and also the one-fourth ($\frac{1}{4}$) belonging to the working interest after a certain amount is run to the credit of W. C. Warner as heretofore arranged.'

" This paper just recited is known in plaintiffs' bill as ' exhibit A.'

" On the same day (September 14, 1885) the parties, B. G. Morrison, C. F. Morrison and Mary E. Shearman, executed the following agreement, known in the plaintiffs' bill as ' exhibit B,' to wit:

" ' It is hereby agreed as follows : That whereas Mary E. Shearman, B. G. Morrison and C. F. Morrison are duly bound in a judgment of $10,000, as purchase money of a certain property bought of W. C. Warner which judgment bond and mortgage is payable one half in one year and one half in two years, Now it is here mutually agreed, that all oil sold, whether of the royalty or the working interest on the lease, to the Anchor Oil Co., and others, being 700 acres more or less of tract No. 3725, one half is to be deposited in the Warren Savings Bank to the credit of the Warner mortgage, and none of said money to be withdrawn without the written consent of all the parties hereto ; it being an accumulating fund for the purpose of discharging said mutual obligation as fast as it falls due ; the other half of said royalties to be divided from time to time, whenever oil is sold, one third to each of the parties hereto or their legal representatives.   If the product of oil should be small then after ninety days from date hereof, ¾ of all oil to be credited to the Warner mortgage and the balance divided as above stipulated.'

" W. C. Warner, on Dec. 24, 1885, or thereabouts, having completed his trust, executed division orders for the oil, as did also Cadwallader, the Anchor Oil Co., and B. G. Morrison, for himself and as agent and attorney, assigning and setting over each to the other the interests in the royalty and working interest of the oil produced from this land.

" W. C. Warner at or about this same time (Dec. 24, 1885) paid over to B. G. Morrison on account of the parties to this suit the sum of $800.73.

" When according to the terms of the lease between the parties the $7,500 bonus was to be paid, Cadwallader and the Anchor Oil Co. thought that it should not be paid in full, and so the matter of bonus, after a consultation between B. G. Morrison, C. F. Morrison and Mrs. Shearman, was compromised with Cadwallader and the Anchor Oil Co. at the sum of $4,500, which was paid to B. G. Morrison.

" B. G. Morrison continued to receive the production from the wells on this land until, on Sept. 27, 1886, Mrs. Shearman gave notice to the National Transit Co. (in whose line the oil was run), revoking the before recited power of attorney, and on January 11, 1887, C. F. Morrison notified said Transit Co., revoking said power of attorney. Writs of replevin were issued by B. G. Morrison to Nos. 26 and 27, March term, 1887, to replevy the oil run into the pipe lines, and on February 4, 1887, this bill was filed and an injunction was issued to restrain B. G. Morrison from further prosecuting said writs of replevin, etc.

" The plaintiffs claim that B. G. Morrison became the trustee of all the parties interested, and whatever money he received subsequent to his appointment as attorney or agent under the papers dated Sept. 14, 1885, was received as trustee upon a specified trust, to deposit the moneys received by him for the payment of the Warner mortgage.

" The defendant claims he was not a trustee as claimed by plaintiffs.

" That from time to time as moneys came into his hands from the sale of oil devoted to the trust purpose under exhibit ' B,' he paid off debts due by Stephen R. Morrison's estate of which he is administrator.

" That the proceeds of the other half of the oil not devoted to the trust fund under plaintiffs' exhibit ' B,' the bonus money, $4,500, and the $800.73 received from Warner, were not received upon said trust. That defendant has paid over to plaintiffs large sums thereof in cash; paid out large sums upon their order; upon improvements made for them upon the common property; expenses of operating said property; defending the said property; reasonable expenses of necessary litigation, in which said common property was involved. That defendant has a large claim for services rendered by him, outside his duties as administrator in selling said common property, and in placing the same in the advantageous situation it is now for plaintiffs. That defendant has also a reasonable claim for expenses necessarily incurred in rendering said services, and, finally, the plaintiffs are indebted to the defendant."

The master further reported that B. G. Morrison was not trustee of the bonus money of $4,500; nor of the $800.73 received from W. C. Warner; nor of $153 received for rigs sold

to Cadwallader and the Anchor Oil Co. (In a statement in evidence made by " B. G. Morrison, trustee of the Royalty Interest," he charged himself with all the above.) Also that B. G. Morrison agreed not to charge any compensation for the duties imposed by agreement " B "; and that in selling the common property he was a co-tenant and not entitled to compensation in the absence of a special agreement. He stated an account between the parties in which he allowed B. G. Morrison credit for tenements . . . . $1,428.26

Ditching etc. . . . . . . .     457.88

Total . . . . .     $1,886.14

And for the following items:

(1) Hotel bills, board and lodging, etc. . .     $184.23
(2) Railroad fare, hack hire . . .     245.06
(3) Telegrams, hotel bills, car fare, hack hire,
etc., McKean county suits . . .     289.03
(4) { Telegraphing and postage . . .     23.61
Freight bills and expressage . . .     .25
Sundry legal expenses . . . .     41.27
(5) Old debts, labor, etc. . . . .     521.61
(6) Defending lines and boundaries . .     439.70
Paid Mrs. Stephen R. Morrison . .     67.98
(7) Sundries . . . . . .     188.26
Taxes . . . . . . .     594.40

Total . . . . .     $2,595.40

The " old debts, labor, etc.," in the above schedule were old debts of the estate of Stephen R. Morrison.

The master recommended that the costs be divided equally among the parties.

On exceptions filed to the master's report the court below made the following order:

" The plaintiffs' bill alleges and the master finds that on the 14th of September, 1885, the plaintiffs, by the writings marked exhibits 'A' and 'B,' constituted the defendant their attorney and agent for the specific purpose designated in said writings.

" The bill further alleges that the defendant, as trustee of the plaintiffs, received the sum of $800.73 from sales of oil made by W. C. Warner, and the further sum of $4,500 on a lease to

the Anchor Oil Company. As to these items the answer asserts and the master finds that they were received by defendant upon matters outside the trust relations, and not involved in this controversy.

" The bill avers that the defendant has violated his duty as such agent and trustee, and prays that an account be taken and stated between the plaintiffs and defendant of moneys, matters and things relating to the alleged trust.

" It appears to us that the only questions raised by the pleadings and properly before the master were :

" Was there the trust relation between the plaintiffs and defendant as claimed in the bill ?

" What moneys, matters and things were included or brought within the scope of such trust relation?

" Has the defendant violated and been derelict in his duty as such trustee, and, if so, how stands the account between the plaintiffs and the defendant so far as the same is connected with and grows out of the alleged trusteeship of the defendant?

" We think the testimony taken and the report of the master, and the account as stated, embraces matters not in issue, and hence, without now passing on the numerous exceptions, the report is now referred back to the master to take and report the account in accordance with the suggestions herein made."

The master filed a further report in which he found that the only trust money received by defendant was the one half of the proceeds of the oil sold from the royalty and working interest which was to be applied to the Warner mortgage ; and that as B. G. Morrison did not put these moneys in bank as provided by the agreement, nor enter a receipt on the records of the mortgage before the bill in this case was filed, he was derelict in fact but not intentionally. The master restated the account on this basis and put the costs on the defendant. On exceptions to this report the court below, by MEHARD, P. J., filed the opinion and made the decree following :

" The first question raised by plaintiffs' exceptions is : How much of plaintiffs' money did defendant receive in the capacity in which he is sued ? That capacity was such as was created by exhibit ' A ' of plaintiffs' bill. The plaintiffs thereby constituted the defendant their ' lawful attorney and agent ' to receipt for and to sell their shares of the oil produced on land

leased to the Anchor Oil Company and others.    It was further
therein expressed that said power of attorney should cover
both the one eighth royalty and 'the one-fourth belonging to
the working interest after a certain amount is run to the credit
of W. C. Warner, as heretofore arranged.'    The duties of de-
fendant were further defined in the instrument, exhibit 'B,'
made ,by the parties at the same time with exhibit 'A,' and
constituting with it an entire document.    It was therein stipu-
lated that, 'whereas, Mary E. Shearman, B. G. Morrison and
C. F. Morrison are duly bound in a judgment of $10,000 as
purchase money of a certain property bought of W. C. War-
ner, which judgment and mortgage is payable one-half in one
year and one-half in two years;' therefore, of all oil sold,
whether of the royalty or of the working interest, one half
should be deposited in the Warren Savings Bank to the credit
of the Warner mortgage, and that none of said money should
be withdrawn without the written consent of all the parties; it
to be an accumulating fund for the purpose of discharging said
mutual obligation as fast as it would fall due; and that the
other half of said royalties should be divided from time to
time, as oil was sold, one third to each of the parties; but, it
was provided, if the product of oil should be small, then, after
ninety days from the date of the instrument, three fourths of
all the oil should be credited to the Warner mortgage and bal-
ance divided as above stated.

"Those instruments did not create a technical trust, yet they
imposed on defendant duties strictly fiduciary.    He became a
quasi trustee, and as such answerable to his principals in a
court of equity.    Bank of Kentucky v. Schuylkill Bank, 1
Parsons, 180; Campbell's Adm'r v. Boggs, 48 Pa. 524; Pom-
eroy's Eq., vol. II., § 1088.    This trust was not created by
the appropriation of a part of the money defendant should re-
ceive under his appointment to a fund for the payment of the
Warner mortgage; but it belongs to the nature of the authority
given him by plaintiffs to act for them.    Hence all moneys he
received by virtue of such authority were trust funds.    He re-
ceived, on account of the one eighth royalty, seven thousand
two hundred and nine dollars and thirty-five cents ($7,209.35),
and from the working interest four thousand and eleven dollars
and ninety-one cents ($4,011.91).    Two thirds of these items

belonged to the plaintiffs, and both were expressly put in the care of defendant. The defendant likewise received for himself and C. F. Morrison, on the same accounts, three hundred and seventy-eight dollars and fifty-two cents ($378.52). One half of this belonged to C. F. Morrison.

"B. G. Morrison, the defendant, received for himself and the plaintiffs eight hundred dollars and seventy-three cents ($800.73) from one W. C. Warner, being money which Warner had realized from the sale of oil belonging to the parties to this suit, but run in the pipe line to Warner's credit under the arrangement referred to in exhibit 'A.' This oil was produced from the same interests intrusted to the defendant's care by that instrument, but it does not appear to have been in the mind of the parties when defendant was appointed attorney in fact and agent for the plaintiffs. The evidence shows that the money in Warner's hands was not spoken of by the parties before it was received by the defendant. There was, therefore, no express authority given him to receive plaintiff's share. But defendant was at that time representing plaintiffs as quasi trustee in kindred matters. At the same time Mr. Warner paid defendant this money he made an assignment of the working interest to him as trustee for the plaintiffs—that being the interest from which he had realized the money. Defendant likewise charged himself as trustee with this fund; and the evidence shows that when plaintiffs were informed of its receipt by defendant, they did not question his authority to receive it, but regarded then, and have ever since, treated it as a fund rightfully received for them by the defendant under the authority given him by the instruments 'A' and 'B.' From these circumstances it is evident that, while the terms of those instruments did not cover this fund, yet it was the character they gave to defendant as plaintiffs' trustee, which enabled him to get their share of it; that defendant did receive it by being the trustee for plaintiffs, and that both the defendant and the plaintiffs understood the authority given by those instruments to be large enough to cover this act of defendant. Hence the authority which was originally lacking has been supplied by the subsequent conduct of the parties; and the fund, which defendant thus received as a trust, cannot now be treated, to his advantage, as a common debt.

" The defendant also received for himself and the plaintiffs forty-five hundred dollars ($4,500) from the lessees of their oil land, through a compromise of a contingent royalty. The defendant was not given any power to represent the plaintiffs in this transaction other than that conferred by the instruments ' A ' and ' B.' Pltffs.' test., pp. 22, 42. This item was not a part of the royalty of one eighth, or of the one fourth working interest mentioned in said instruments. But the defendant, with the knowledge and implied consent of plaintiffs, acted for them as their attorney in fact and agent in this matter, as though it were a part of the subjects intrusted to him under those instruments. See deft's. test., pp. 16, 17; pltff's. test., pp. 20, 22 ; 42, 43 ; 65, 66. All parties appear to have considered at the time that the receipt of this money by defendant was so authorized, and defendant charged himself with it as trustee. If it were ultra vires, yet it was accomplished by defendant through assertion of his authority as trustee ; and, as a proper act in that capacity, it has been ratified by the plaintiffs. It is therefore too late to give it another character to plaintiffs' injury.

" Defendant received a further sum of one hundred and fifty-three dollars, for himself and the plaintiffs, for timber sold from land owned by the parties as tenants in common. The fact that defendant was a tenant in common of the land from which the timber was sold, and seems to have been the one who sold it, explains why the money was paid to him and determines the character in which he received it. This was not received as trustee.

" A few days after this suit was brought, defendant applied to the Warner mortgage, he being the mortgagee as administrator of Stephen R. Morrison, deceased, the sum of fifty-six hundred dollars ($5,600). This was an equal credit to himself and to each of the plaintiffs. Before that time he had paid to Mary E. Shearman thirteen hundred and seven dollars and twenty-six cents ($1,307.26), and to Charles F. Morrison fourteen hundred and thirty-four dollars and forty-five cents ($1,434,45). The defendant paid taxes on the common property to the amount of five hundred and ninety-four dollars and forty cents ($594.40). He also paid to the widow of Stephen R. Morrison, the mother of

the parties, sixty-seven dollars and ninety-eight cents ($67.98). It is not questioned that defendant is entitled to credit, as against the plaintiffs, for two thirds of the two last items. The defendant claims that plaintiffs were indebted to him, when he accepted this trust, on account of certain payments made and certain expenses incurred by him, on behalf of plaintiffs and himself. The learned master found the items of this claim to be just and equitable, and gave defendant credit for them. The credit was given, however, on the theory that only so much of the money received by defendant for plaintiffs as should have been deposited to the credit of the Warner mortgage was trust funds. An opposite conclusion on that subject having been reached in this opinion, can the credit claimed be allowed defendant? The answer must be against the credit, because, first, having received the funds as attorney in fact and agent for the plaintiffs, he could not avail himself of the advantage given him by that fiduciary position to apply them to his own benefit, to the injury of his principals: The Bank of the United States v. Macalester, 9 Pa. 475, 483; Tagg v. Bowman, 99 Pa. 376, 380. Second, defendant having received plaintiffs' funds in a fiduciary character, the debts were not due in the same right, and were, therefore, not the subject of set-off: Tagg v. Bowman, 108 Pa. 273, 277. And third, the relation itself implied an agreement not to set off: Russell v. The Church, 65 Pa. 9, 16. And that implication was strengthened by the specific appropriation of one half the trust funds to the Warner mortgage and defendant's express promise to pay plaintiffs their respective shares of the remainder. Hence, in the absence of plaintiffs' consent to such a diversion of the trust funds, this credit could not be allowed defendant.

"The defendant claims credit for money paid out for improvements made on the common property of himself and the plaintiffs, as follows: For repairs on the tenements, fourteen hundred and twenty-eight dollars and twenty-six cents ($1,428.26), and for ditching, etc., four hundred and fifty-seven dollars and eighty-eight cents ($457.88).

"It appears that these improvements were being made while defendant was acting as attorney in fact and agent for the plaintiffs, that they were commenced with the consent and at

the instance of the plaintiffs, as well as of defendant; that while plaintiffs did not at first anticipate so large an expenditure, neither the extent of the improvements nor the amount of money to be used in that way was specified; that all the parties were living on the land while these improvements were in progress and all took some part in directing them; that defendant was the leader and the paymaster; and that, while the plaintiffs made some criticisms as to the manner of some of the improvements and some complaints as to their extent, neither one of them forbade their progress, or withdrew, in a positive way, the consent originally given. From this state of facts, it is considered, the inference fairly arises, that the plaintiffs authorized these improvements and became liable for their proportion of the expense.

"Can plaintiffs' proportion of this expense be allowed defendant in his account as trustee? The defendant was the treasurer and paymaster for the plaintiffs, as well as for himself. All parties evidently regarded him as the source from which the labor and materials for these repairs and improvements were to be paid. The plaintiffs must have believed that he was paying their proportion out of such of their money as they supposed he had in his hands. So believing, they neither forbade further payments nor prohibited further improvements. It is considered that their silence, under those circumstances, was consent. But they did not suppose he had in his hands the money specifically appropriated to the Warner mortgage. They had the right to rely on the presumption that defendant had done his duty and deposited that beyond his control, to the credit of the mortgage. The other funds in defendant's hands were the money realized from sale of timber ($153), and the part of the trust money payable to the plaintiffs personally. It is, therefore, considered that plaintiffs' proportion of the expense of the improvements on their common estate cannot be allowed as a credit on that part of the trust fund belonging to the Warner mortgage, but that, after deducting the sum realized from the timber, the balance should be allowed as a credit, consented to by plaintiffs, on that part of the trust fund payable to themselves.

"The defendant makes a further claim of credit for services

rendered to plaintiffs on behalf of their common estate before he became trustee, and for services as trustee. The first part cannot be allowed because it does not pertain to the trust and has not been consented to as a credit by plaintiffs. The second part cannot be allowed, because the learned master has found, on sufficient evidence, that defendant agreed to serve as trustee without compensation.

" The learned master has recommended a decree imposing the costs of this case on defendant, which is the ground of an exception by defendant. This exception, however, cannot be sustained, because, first, the main issue has been determined against the defendant ; and second, this suit was caused by defendant's disregard of his duty as trustee. The defendant has never deposited any money in the Warren Savings Bank to the credit of the Warner mortgage, or so as to indicate that it belonged to a fund intended for the payment of that mortgage. It was not until after this suit was brought that he entered a credit on the mortgage. It is true, that before suit was brought he had used some of the trust funds to pay on the debts of Stephen R. Morrison's estate, the purpose to which he, as administrator of that estate, was to apply the money realized from the Warner mortgage. But the payment of those debts out of the trust funds was, neither in letter nor in effect, a compliance with defendant's duty as trustee. The defendant sustained at that time three distinct characters : that of an individual, that of administrator of Stephen R. Morrison's estate and that of trustee for the plaintiffs. A confusion of those characters might work an injury to his bail as administrator, to the creditors or beneficiaries of that estate, or to his cestuis que trust. It was therefore important to determine the moment when a sum of money passed from defendant's hands in one character, into his hands in another. Defendant had no more right to use the trust funds as administrator, until after it had been actually applied on the Warner mortgage, than he had to use it as an individual. This misstep was doubtless caused rather through lack of careful business methods, than through intentional wrong.

" The foregoing conclusions result in the following figures, viz. :

| | | |
|---|---:|---:|
| B. G. Morrison received for himself and for Mary E. Shearman and Chas. F. Morrison from the one eighth royalty | $ 7,209 | 35 |
| The working interest | 4,011 | 91 |
| W. C. Warner | 800 | 73 |
| Contingent royalty (bonus) | 4,500 | 00 |
| | $16,521 | 99 |

| | | |
|---|---:|---:|
| Of this Mary E. Shearman's share was | $5,507 | 33 |
| Of this share one half was to be appropriated to the Warner mortgage fund, to wit | 2,753 | 66½ |
| Defendant applied on that mortgage | 5,600 | 00 |
| One third of which was for benefit of Mary E. Shearman, i. e. | 1,866 | 66⅔ |

This left due to Mary E. Shearman's share of the Warner mortgage fund . . . . . . $886 99⅚

| | | |
|---|---:|---:|
| Of her share one half was to be paid to her personally, i. e. | $2,753 | 66½ |
| Defendant paid her | 1,307 | 26 |

He also paid for her one third of the following items, viz.:

| | | |
|---|---:|---:|
| Taxes | $  594 | 40 |
| Improvements—Repairs of tenements | 1,428 | 26 |
| Ditching, etc. | 457 | 88 |
| To widow of S. R. Morrison | 97 | 98 |
| | $2,548 | 52 |
| Less money realized from timber | 153 | 00 |

One third of . . . . $2,395 52 is       $798 30⅔

Making a total credit on this part of trust fund of      $2,105 56⅔

Which left a balance payable to Mary E. Shearman personally of . . . . . . $648 09"

The balance due C. F. Morrison was then calculated on the same basis.

## " DECREE.

" And now it is considered, adjudged and decreed, that, at the date this suit was brought, B. G. Morrison, the defendant, had in his hands, as attorney in fact and agent for Mary E.

Shearman, one of the plaintiffs, the sum of fifteen hundred and thirty-five dollars and eight cents ($1,535.08), whereof, by the terms of said trust, eight hundred and eighty-six dollars and ninety-nine cents ($886.99) were appropriated to a fund for the payment of the Warner mortgage; and on the same date defendant had in his hands, as attorney in fact and agent for Charles F. Morrison, the sum of fifteen hundred and ninety-seven dollars and fifteen cents ($1,597.15), whereof, by the terms of said trust, nine hundred and eighty-one dollars and sixty-two cents ($981.62) were appropriated to a fund for the payment of the Warner mortgage.

"It is accordingly ordered and decreed, that said B. G. Morrison, the defendant, deposit both the said sums so appropriated, together with interest thereon from date of this suit, in the Warren Savings Bank of Warren, Pa., in such a manner as to designate said money as a fund for the payment of the Warner mortgage mentioned in exhibit ' B ' of plaintiffs' bill, and this he shall do within twenty days after the notice of said decree to him or his solicitor, otherwise execution may issue for the amount unpaid, in favor of the plaintiffs ; and further, that defendant pay to plaintiffs, respectively, the balance of said trust funds owing to them as above decreed, together with interest thereon from the date of this suit ; and further, that defendant pay the costs."

The first three *assignments of error* were as follows :

"First. The learned court below erred in holding that the defendant, B. G. Morrison, received from W. C. Warner the balance of $800.73 in the hands of the latter, and from J. A. Cadwallader and the Anchor Oil Co., upon settlement with them of the contingent bonus, the item of $4,500, in the same character and capacity of trustee in which he is sued.

"Second. The learned court below erred in holding that the item of $800.73 received from W. C. Warner, and the item of $4,500 received from J. A. Cadwallader and the Anchor Oil Co. were received by the defendant, B. G. Morrison, in a different character and capacity from that in which he was acting in paying the several sums of money for which he claims credit in his accounting in this proceeding.

"Third. The learned court below erred in holding that the sum of $11,221.26 received by the defendant, B. G. Morrison,

from the sale of the one half oil from the royalty and working interest not specifically applicable to the Warner mortgage, was received by him in a character and capacity that precludes him from receiving credit for the several items claimed by him in accounting in regard to said fund in this proceeding."

The 4th to 10th *assignments of error* specified the refusal to allow defendant credit for the items allowed by the master in his first report and numbered in parentheses 1–7 ; and the 11th *assignment* was the failure to allow defendant the credits claimed by him in his accounting, covering the same items in detail.     The 12th *error assigned* was imposing the costs on the defendant.

*D. I. Ball*, with him *C. C. Thompson*, for appellant.

*H. H. Goucher*, for appellees.

PER CURIAM, May 23, 1892:

A careful examination of this case fails to disclose error on the part of the learned judge below, and we affirm the decree for the reasons given by him.

The decree is affirmed, and the appeal dismissed at the cost of the appellant.


# Lawrence, Appellant, v. Keener.

149   402
199   115
199   118

*Life-estate—Sheriff's sale—Act of January 24, 1849—Notice.*

Sequestration of a life-estate in realty is unnecessary where there is an adverse possession in hostility to it; or where the debtor claims to hold in fee ; or where the creditor has reasonable ground to believe that the debtor owns in fee.   In all such cases the defendant's interest in the land may be sold on an ordinary execution without complying with the requirements of the act of January 24, 1849.

*Married women—Real estate—Resulting trust—Evidence—Declarations.*

Where real estate standing in the name of the husband has been sold at sheriff's sale as his property, and, in ejectment against him, he sets up a resulting trust in favor of the wife by reason of her payment of the purchase money, the wife having died intestate before the sheriff's sale, he cannot testify as to what his wife said about the ownership of the land while he was in possession of it with her; nor is evidence admissible of her declarations to a third person as to her having property.

*Notice.*

In such a case, where there was no evidence that the wife exercised